**Juan C. Chavez**, OSB #136428
**Franz Bruggemeier**, OSB #163533
**Jonathan Gersten**, OSB #174131
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

      Of Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| TED TIMMONS, <br><br> Plaintiff, <br><br>    v. <br><br> CITY OF PORTLAND, and BRYCE ASKELSON, <br><br> Defendants. | Case No. 3:22-cv-1235 <br><br><br> COMPLAINT <br><br> Civil Rights Action (42 U.S.C. § 1983); and State Tort Law (Battery, Assault, Negligence, and Intentional Infliction of Emotional Distress) <br><br> JURY TRIAL DEMANDED |

     On August 22, 2020, Ted Timmons, Plaintiff, was out on the streets protesting the killing of Black people by United States police departments, including the Portland Police Bureau ("PPB"). Earlier in the day, Plaintiff had witnessed PPB's inaction towards a gathering of Proud Boy and other alt-right fascists. The Proud Boys had gathered and shot the crowd with weapons similar to the ones PPB used and terrorized the community unmolested by the police. In contrast, later that night, Portland Police Officer Defendant Bryce Askelson attacked Plaintiff with his baton while Plaintiff was engaging in nothing beyond passive resistance. This was not an

accident: Defendant City of Portland has improperly trained Portland Police officers into

ignoring PPB Directive 1010, which instructs officers to, among other rules, follow the *Graham*

standard, instead use unreasonable force when in crowd control events. Defendant City has also

allowed a culture of impunity amongst its officers, and fostered a hostility against police

accountability protesters. Plaintiff suffered physical and emotional injury because of the City's

deliberate indifference and Defendant Askelson's retaliatory excessive force.

## JURISDICTION

1.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. §

1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the

State tort claims pursuant to 28 U.S. Code § 1367(a).

## VENUE

2.      Venue is proper within the District of Oregon because all of the events giving rise to this

claim occurred in this judicial district, and all defendants reside in this judicial district. 28 U.S.C.

§ 1391(b). The acts and practices alleged herein occurred in Portland, Multnomah County,

Oregon.

## PARTIES

3.      Ted Timmons, Plaintiff, is a citizen of the State of Oregon.

4.      Defendant City of Portland (hereinafter, "City") is a political subdivision of the State of

Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau

(hereinafter, "PPB").

5.      Defendant Bryce Askelson is a Portland Police Officer. At all times relevant, Defendant

Askelson was at all times relevant acting under color of law. Based on public records requests,

Plaintiff upon information and belief that Defendant Askelson is the officer depicted in videos

attacking Plaintiff while wearing a helmet with the number "34" prominently displayed. Plaintiff

reserves the right to substitute the correct party if this Defendant was erroneously named. He is

sued in his personal capacity.

## FACTUAL ALLEGATIONS

## I. Introduction: Black Lives Matter.

6.      The disproportionate and excessive use of force against Black people by police officers in

the United States is a well-documented, systemic problem. It exists in every police department in

this country, including the PPB.

7.      For many years, advocates and activists have attempted, largely unsuccessfully, to get the

City to address and reduce the Portland Police Bureau's disproportionate use of force, stops,

searches, seizures, and arrests of Black people, Indigenous people, and people of color. Efforts to

address the Portland Police Bureau's racial profiling dates back to the 1990s.[1] And yet, despite

all the recommendations, implemented or more often, not, PPB continues to engage in

disproportionate targeting of Black people in stops, searches, seizures, and uses of force.

8.      On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was

murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three

of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr.

Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not

breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the

country.

9.      For many Americans, and particularly Black Americans, the murder of George Floyd, in

broad daylight while being openly filmed by a witness, was the proverbial straw that broke the

---

[1] https://www.portlandoregon.gov/police/article/32381

camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by their

political and law enforcement leaders, millions of Americans took to the streets in protest,

demanding an end to police violence and white supremacy, and refusing to leave those streets

unless and until meaningful change is made.

10.     Protests against police violence have been met with police violence in nearly every city

around the country. Videos shared in the press and on social media show the police in this

country out of control: attacking journalists, attacking bystanders, threatening children,

assaulting people for insulting them, engaging in drive-by attacks with "less lethal" weapons,

planting weapons in the hands of people arrested, pulling off demonstrators' CDC-recommended

facemasks and macing them, kettling whole groups of protesters only to launch tear gas at them,

driving their cars directly through crowds of people, using military helicopters in efforts to

terrify civilians, discussing plans to shoot protesters, and above all, using massive amounts of

tear gas and impact weapons in a systemic effort to stop people from protesting police violence.

This violent police response has only strengthened the resolve of protesters.

11.     Beginning on May 29, 2020, Portlanders have been demonstrating in the streets

demanding justice for George Floyd and demanding an end to police violence. The PPB, like

police departments throughout the country, have met these demands with violence.

12.     On June 23, 2021, Mayor Ted Wheeler, who in addition to being the chief executive for

the City of Portland is also the PPB's commissioner-in-charge, articulated this policy succinctly

as wanting protesters to "hurt."[2]

### III. PPB's Pattern and Practice of Targeting Police Accountability Protesters

---

[2] Aaron Mesh, *Portland Mayor Wants Reed College to Expel Student If He's Convicted of Smashing Downtown Windows*, Willamette Week (April 23, 2021), https://www.wweek.com/news/city/2021/04/23/portland-mayor-wants-reed-college-to-expel-student-if-hes-convicted-of-smashing-downtown-windows/

13.     On several occasions since 2017, demonstrations in support of police and against the Black Lives Matter movement have occurred in Portland. During these demonstrations, Defendants did not use tear gas, impact munitions, nor any force against these protestors. Instead, PPB provided escorts to maintain the safety and security of these protestors, an accommodation not afforded to those protesting police violence. For example, on August 17, 2019, a group of approximately 500 pro-fascist, pro-police, anti-Black activists from across the country held an unpermitted rally in Tom McCall Waterfront Park in downtown Portland. The stated aim of the rally organizers was to waste city funds and resources. PPB made extensive accommodations for the rally, including closing the Hawthorne Bridge to traffic, erecting concrete barriers around the site of the rally, and placing a heavily armed police presence between the fascist rally and counter protesters. After the far-right rally in Tom McCall Waterfront Park, PPB opened the Hawthorne Bridge for the exclusive use of the fascist rally. PPB declared a civil disturbance after the far-right rally dispersed, ultimately arresting 13 counter protesters. The organizers of the fascist event announced they would return to Portland each month to continue to waste city resources.

14.     Likewise, on August 22, 2020, many anti-Black Lives Matter protestors descended on Portland, armed with paintball guns, metal rods, aluminum bats, fireworks, pepper-spray, rifles and handguns in an attempt to intimidate and rally against Black Lives Matter protestors. Defendants did not intervene or arrest these pro-police demonstrators for posing threats to Portland community members. Tusitala "Tiny" Toese, who had an outstanding warrant for his arrest, was present, seen, and identified by Defendants, but not arrested. In contrast, PPB members arrested Demetria Hester, a Black Lives Matter leader, less than two weeks prior.

15.     Similarly, on September 26, 2020, a group of approximately 200 pro-fascist, pro-police, anti-Black activists descended on Delta Park for a rally for the express purpose of provoking a violent confrontation with anti-fascist activists. They open-carried firearms within the park, in violation of city code, set up armed check points to control access to the park, and forcibly removed people they decided were not there to support their fascist cause. At least one individual was jumped and given a concussion by the violent mob. At one point, a vehicle arrived and delivered dozens of homemade shields. Despite the presence of dozens of police officers, including PPB "liaison officers" on foot in the park, defendants did not intervene in any way with this criminal activity. On the same day, at the same time, anti-fascist organizers held a rally three miles away in Peninsula Park. That rally was specifically designed to avoid violent confrontations with the fascist rally. No march was planned. Nevertheless, there was a heavy police presence from PPB, and PPB seized homemade shields from participants and arrested individual participants.

### IV. PPB's Pattern and Practice of Illegal Use of Force at Protests

16.     PPB has a policy or practice of using force without individualized justification to disperse protestors. From May 30, 2020 and onwards, PPB regularly used force consistent with this policy and practice against people like Plaintiff, *i.e.*, without individualized justification to use force. This policy and practice existed to punish people like Plaintiff who wanted to call attention to PPB's rampant lawlessness and violence against the public.

17.     Former PPB Chief Jamie Resch stated in a news conference on June 3, 2020 that the decision to use tear gas, other riot control, and "less lethal" weapons against a crowd of protesters the evening prior was made by incident commanders, such as John Does 2-10, at the scene.

18.     Nearly a year after protests began, PPB has failed to accurately document or evaluate its officers' use of force against protesters. PPB, including John Does 1-10, has demonstrated that it does not take criticisms of its use of force seriously, and it is unwilling or unable to honestly assess, much less ameliorate, its pattern and practice of unconstitutional use of force against protesters without outside orders or supervision.

19.     In an evaluation of PPB's after-action reports (AARs) and other Bureau documentation reviewing and assessing its response to protests between May 29 to November 15, 2020, the attorneys in the U.S. Department of Justice Civil Rights Division ("USDOJ") stated that "PPB's self-assessment insufficiently analyzes its management of force, its members' justifications for force, and the organization's plan to enforce compliance with policy and training. Instead, PPB focuses primarily on external factors beyond its control while over-relying on training and software to address the few faults it is willing to own."

20.     PPB broadly portrays all force as justified and evaluated itself as doing an excellent job handling the nightly protest.

21.     PPB has a pattern of misusing the phrase "active aggression" to justify force against individuals who engaged in passive resistance or merely failed to disperse. This includes people otherwise complying with orders to disperse but not doing so at the desired and unreasonable pace of PPB.

22.     PPB did not track an inventory of munitions or make a daily count of the type and amount of force used against individuals for most of the summer of 2020.

23.     PPB did not assess whether officers violated PPB policies related to using force, reporting force, and reviewing force reports. In its evaluation of use of force at protests, PPB

supervisors focus on the articulation of members' justifications for using force, rather than whether a particular use of force was justified.

24.     PPB has failed to issue use of force warnings to individuals, or confirm that subjects heard use of force warnings, before using force on protesters.

25.     The PPB supervisors assigned to complete AARs had little to no crowd management training.

26.     PPB has failed to hold officers, supervisors, and executives accountable for using or approving force without sufficiently articulating a permissible justification.

27.     PPB scheduled a Rapid Response Team (RRT) training for April, 2021, and only created lesson plans for parts of the training after USDOJ requested copies. PPB ended up cancelling this training because the materials and outlines were insufficient to meet the USDOJ's required standards.

28.     PPB treated the failure to disperse as sufficient justification, in and of itself, to use force against protesters. PPB did not engage in individualized assessments of the reasonableness of a particular use of force against a particular person, as required by their PPB Directive 1010. Instead, the officers on the ground and their supervising officers believed that a mere failure to disperse, which is only passive resistance, was sufficient to justify the use of indiscriminate force. This unconstitutional policy is justified, in part, by a different directive, PPB Directive 635.10.

29.     As USDOJ noted in their June 30, 2022 compliance report, "In force reviews covered by these investigations, PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, *because they*

*were authorized to use greater force under Directive 635.10.*"[3] (Emphasis added.) Later in their

report, USDOJ continues: "PPB has repeatedly asserted that RRT training instructed members

that they could use force based on PPB's Directive 635.10, without following the requirements

of Directive 1010.00."[4]

30.     As the USDOJ also noted in the June 30, 2022 report, even when the Bureau does

acknowledge the issues with its training and directives, that is not reflected in disciplinary

outcomes:

> "[T]he City failed to identify misconduct in several cases and did
> not hold any supervisors responsible for their conduct. In the
> accountability process we continued to see PPB members from line
> officers to deputy chiefs conflate the actions of the crowd generally
> with the individual justification required for each separate
> application of force. When the City reaches a sustained finding, it
> does not necessarily impose the applicable discipline. Seven times
> during this compliance period, the City voluntarily resolved
> grievances of imposed discipline by agreeing that the 'discipline be
> rescinded' and 'that all references of this matter be removed from
> [the Grievant's] personnel file.'"[5]

31.     The Bureau continues to solidify the view amongst its ranks that the public, courts, and

DOJ have all been wrong to criticize its tactics and actions during the 2020 Movement for Black

lives. In a self-audit, "PPB gave itself an overall compliance rate of 96%. Even ignoring force

policy requirements and assessing only the reporting requirements of crowd control policy, as

PPB designed its audit to do, a 96% compliance rate is inconsistent with the City's

acknowledgement that it did not complete timely AARs or conduct full interviews and

---

[3] *United States v. City of Portland*, USDC of Or. Case No. 3:12-cv-02265-SI (2012), Dkt. 292-1, p. 4.
[4] *Id.* at p. 25.
[5] *Id.* at p. 58.

investigations of force during the 2020 protests."[6] In private "procedural justice" trainings, the

City continues to tell its own officers that "99% of the time we did [crowd control] well."[7]

32.     Ultimately, almost one year after the death of George Floyd, Defendant has failed to

acknowledge "the importance of PPB members complying with constitutional standards,

adhering to approved policies, and enforcing policy violations." Since May 31, 2020, the City

has increased its inventory of crowd control weaponry for use against demonstrators.

33.     Defendant City has demonstrated that it will without remorse continue to enforce its

unlawful pattern and practice.

### V. Court Orders and Contempt

34.     As a result of PPB's lawless uses of force against protesters, Federal and State Courts in

Oregon have used their remedial powers to restrain PPB's excesses.

35.     The case *Don't Shoot Portland, et al v. City of Portland*, Or. Dist. Case No. 3:20-cv-

00917-HZ, was filed on June 6, 2020 directly in response to the opening days of mass police

violence in the wake of George Floyd's murder. The Plaintiffs sought and received an injunction

placing limits on police use of force at protests shortly after filing their case. The Court later

found that PPB's conduct on June 30, 2020, violated the Court's order—specifically owing to the

use of force that targeted protesters who were not actively aggressive.

36.     Through the *Don't Shoot* litigation, the public learned that PPB had trained their riot

police with incorrect use of force standards. PPB training documents included the citation of an

opinion overruled by *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th

Cir. 2002). The materials also incorrectly described protesters who walked slowly as "actively

aggressive."

---

[6] *Id.* at p. 22.
[7] *Id.* at p. 31.

37.    One training concluded with a slide that caricatured police accountability protesters and advocated for violence against them.



38.    Another training slide described protesters yelling at a line of riot police as "active aggression."



39.    Defendant City also encouraged its Bureau members to scrutinize the content of protester signs to determine the "attitude" of the crowd.



Signs can help determine Attitude and demeanor of crowd

40.    The case *Index Newspapers LLC, et al v. US Marshals Serv., US DHS, and City of Portland*, Or. Dist. Court Case 3:20-cv-01035-SI was filed on June 28, 2020. The Plaintiffs were non-protesters who were passively observing protests—members of the media, legal observers—who were nonetheless targeted for injury and/or dispersal by PPB. The Court enjoined PPB from this practice.

41.    The case *ACLU & Protestor #1 v. City of Portland*, Mult. Co. Cir. Case No. 20CV27116 was filed in July 2020 after it became apparent PPB had been violating ORS 181A.250. ORS 181A.250 prevents law enforcement from surveilling people based on their political activities. The State court enjoined PPB from this practice in September 2020.

42.    As partly discussed above, the United States Department of Justice has maintained a quasi-consent decree against the Portland Police Bureau because of its pattern and practice of using excessive force against people with mental illness. *United States v. City of Portland*, Or.

Dist. Case No. 3:12-cv-02265-SI. Part of the City of Portland's obligations under its settlement agreement with the USDOJ, PPB had to maintain records regarding its use of force and comply with the U.S. Constitution. The USDOJ found PPB in violation with the settlement agreement owing to its actions in 2020 and has sought remedial sanctions against the City of Portland.

43.    As described in the preceding paragraphs, numerous courts have found that PPB has violated the law on multiple occasions—acutely so in the summer of 2020, when they injured Plaintiff.

## VI. August 22, 2020

44.    In the late evening of August 22, 2020, at least a hundred individuals assembled outside the Penumbra Kelly Building.

45.    Because Plaintiff had witnessed the Portland Police and other police officers use high velocity projectiles and full-line charges (colloquially known as "bull rushes") against passively resistant protesters like himself, he brought a small plywood shield with rounded edges to protect himself.

46.    Plaintiff stood in the west driveway of the Penumbra Building along E Burnside Ave., staying on the concrete apron. When PPB decided to "bull rush" the crowd, he began to move westward as directed by the PPB officers on their loudspeaker. The loudspeaker frequently announced that this was the Portland Police Bureau making these demands.

47.    It was then that Defendant Askelson targeted Plaintiff for injury. Defendant Askelson broke ranks to charge at Plaintiff. Defendant Askelson didn't use words or give commands; he just began hitting Plaintiff with his baton, including with the pointed end of his truncheon into Plaintiff's torso. *See Figure 1.*



Figure 1. Plaintiff circled in yellow. Askelson circled in red.

48.     Plaintiff continued to do his best to be passively resistant to the battery, but after

Defendants attacked the persons next to him from different sides, it forced him into a large metal

bus bench.

49.     Being stuck on the bus bench allowed Defendant Askelson opportunity to hit Plaintiff in

the mouth with his baton with multiple strikes. The strikes caused lacerations inside his mouth.

*See Figure 2.*



COMPLAINT
Page 14 of 23

*Figure 2*. Plaintiff's mouth after the incident.

50.     After being battered by Defendant Askelson, another PPB officer pepper sprayed Plaintiff

from about six feet away.

51.     At no time did a PPB officer attempt to arrest Plaintiff. They could not because they did

have probable cause to do so. Nor did they have probable cause to use the significant amount of

force utilized on Plaintiff.

52.     Despite Defendant Askelson having committed a felony of criminal Assault in the

Second Degree (ORS 163.175) in plain view of the other officers, none of the other PPB officers

intervened or arrested Defendant Askelson. This is in accordance with the PPB pattern, practice,

and/or custom to excuse the constitutional violations and criminal actions of their own,

encourage violence amongst their members while at protests, and flagrantly violate constitutional

rights while at protests.

53.     Upon information and belief, Defendant Askelson has not been disciplined by Defendant

City of Portland.

54.     The attack on Plaintiff caused him physical and emotional pain and suffering. He had to

miss work after his boss saw him in visible pain. Defendants' actions did chill Plaintiff's right

and belief that he could speak and have a voice in the City of Portland without being violently

assaulted by its police bureau.

**Claim 1: First Amendment — Unlawful Retaliation Against Speech — Individual Liability
(42 U.S.C. § 1983)**

55.     As described above, Defendant Askelson targeted Plaintiff for injury not because they

had probable cause, but because they took offense to Plaintiff's speech activity.

56.     The First Amendment protects persons from unlawful curtailment of expressive conduct,

assembly, and associations with one another.

57.     Defendant Askelson's retaliatory motive was the but-for cause of Plaintiff's injuries. By

having attacked and injuring Plaintiff, Defendants chilled Plaintiff's political speech, violating

his First Amendment rights.

58.     The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain,

loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all

of his damages in an amount to be ascertained according to proof at trial.

### Claim 2: First Amendment – Unlawful Pattern and Practice – Municipal Liability
### (42 U.S.C. § 1983)

48.     As explained in Claim 1, Defendant Askelson violated Plaintiff's constitutional speech

rights.

49.     Defendant Askelson's conduct is illustrative of a pattern and practice of PPB officers

violating the First Amendment rights of individuals at protest demonstrations against police

misconduct. Defendant City of Portland has a custom and practice of using militarized force

against left-wing or antifascist protestors. Defendants' past Fourth and First Amendment

violations were intended to punish a group of protestors *en masse* for their political speech.

Defendant City of Portland does not use such tactics against right-wing protestors or fascist

protestors, such as the Proud Boys or Patriot Prayer, despite their disobedience of officers' orders

and clear intent to terrorize the community of Portlanders.

50.     The retaliation against Plaintiff was the direct and proximate cause of bodily injury, pain,

loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all

of his damages in an amount to be ascertained according to proof at trial.

### Claim 3: Fourth Amendment – Unlawful Seizure – Individual Liability
### (42 U.S.C. § 1983)

51.     It is clearly established law that an officer may not use force that, in light of the

circumstances and as perceivable by a reasonable, objective officer, is excessive and unnecessary.

52.    In taking the actions described above, including but not limited to shoving and beating a nonthreatening, passively resistant at most person and attacking them with a baton, Defendant Askelson intentionally violated Plaintiff's right to be free from unlawful seizures guaranteed by the Fourth Amendment to the United States Constitution.

53.    Defendant Askelson violated rights held by Plaintiff which were clearly established, and no reasonable official similarly situated to Askelson could have believed that his conduct was lawful or within the bounds of reasonable discretion. Defendant Askelson therefore does not have qualified or statutory immunity from suit or liability.

54.    The actions of Defendant Askelson, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant Askelson, in their individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

55.    The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of her damages in an amount to be ascertained according to proof at trial.

**Claim 4: Fourth Amendment – Unlawful Pattern and Practice – Municipal Liability
(42 U.S.C. § 1983)**

56.    As described in Claim 3, Defendant Askelson violated Plaintiff's constitutional right to be free from unlawful seizures.

57.     Defendant Askelson's conduct is illustrative of a pattern and practice of PPB officers violating the Fourth Amendment rights individuals at protest demonstrations countering white supremacist groups and/or police misconduct.

58.     Defendant City of Portland does not have adequate supervisory review of incidents where officers use force that would correct patterns of unlawful actions by PPB officers in a timely or effective fashion, and rarely categorizes such unlawful seizures as out of policy even when the force is clearly excessive or when the arrest was without sufficient legal justification. Defendant Askelson received inadequate training, supervision, and/or discipline for violating the U.S. Constitution. Defendant City of Portland has effectively condoned this practice by repeatedly failing to correct constitutional violations by officers throughout the PPB.

60.     Defendants City of Portland failed to train and discipline its officers, including Defendant Askelson, to follow the protections against these types of police and government repression and retaliation that have been recognized under the U.S. Constitution, as described above. As a result, Defendant Askelson engaged in unconstitutional conduct that resulted in harm to Plaintiff.

61.     The unreasonable seizure of Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

### Claim 5: Fourteenth Amendment – Due Process
### (42 U.S.C. § 1983)

62.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

63.     Defendants Askelson intentionally and unlawfully shoved and beat Plaintiff and did not provide the Plaintiff any warning or notice of this attack.

64.     Plaintiff posed no threat to the officer and complied with dispersal orders. The officer did not attempt to arrest the Plaintiff and did not take him into custody after the attack, depriving him of his liberty without the due process required by the Constitution, violating his rights.

65.     The actions of Defendant Askelson, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendant Askelson, in his individual capacity, in an amount sufficient to punish him and to deter others from like conduct.

66.     Defendants City are liable for under this count pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

67.     Defendants' unconstitutional acts against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

**Claim 6: Battery**
**(State Tort)**

68.     As described above, agents of the Defendant City of Portland did unlawfully intend to come into physical contact with Plaintiff and did come into contact with Plaintiff when their agents beat, shoved, and pepper sprayed Plaintiff. Defendant City's unlawful and intentional contact with Plaintiff was offensive.

69.     The battery against Plaintiff was the direct and proximate cause of bodily injury, pain, loss of liberty, mental and emotional suffering, worry, fear, and anguish. Plaintiff is entitled to all of his damages in an amount to be ascertained according to proof at trial.

///

**Claim 7: Assault**
**(State Tort)**

72.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

73.     In taking the actions described above, agents of the Defendant City of Portland acted intentionally in placing in apprehension of imminent harmful or offensive contact when PPB threatened to shove, beat, and pepper spray Plaintiff. Plaintiff reasonably believed that further harmful and offensive conduct would occur by Defendant Askelson.

74.     Such actions of agents of the Defendant City of Portland were unreasonable and excessive under the circumstances and were not otherwise privileged or justified under ORS 161.205 *et seq*.

75.     In performing the above-described acts, agents of the Defendant City of Portland directly and proximately caused Plaintiff to suffer non-economic damages.

**Claim 8: Negligence**
**(State Tort)**

76.     Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

77.     The above-described actions of agents of the Defendant City of Portland created a duty of care to Plaintiff. The above-described actions of the Defendant breached that duty of care. Defendant's above-described individual or cumulative acts were unreasonable and excessively dangerous in light of the risk to Plaintiff and in light of the purported purposes of the acts.

78.     In addition to the common law articulation above, ORS 163.175 sets a standard of care that Defendant City's agents breached. Their actions are negligent *per se* as both statutes were violated.

79.    Additionally, agents of the Defendant City of Portland were engaging in an abnormally dangerous activity by shoving, beating, and pepper spraying a nonthreatening, passively resistant at most person. This gives rise to strict liability.

80.    In performing the above-described individual and cumulative acts, agents of the Defendant City of Portland directly and proximately caused Plaintiff physical and/or mental harm while infringing on Plaintiff's rights to be free from unlawful violence.

81.    Plaintiff's physical and mental harms and injuries were within the general type of potential incidents and injuries that made Defendant's conduct negligent. That is, the acts of agents of the Defendant City of Portland in using indiscriminate force, violence, chemical weapons that easily spread, and collective punishment, as described above, against lawful protestors and/or persons engaged in passive resistance created a foreseeable and unreasonable risk of harm of physical and mental harm that reasonably would likely result in infringements of Plaintiff's rights to be free from unlawful violence.

82.    Agents of the Defendant City of Portland are vicariously and directly liable to Plaintiff for the conduct of the Defendant's law enforcement agents alleged herein.

83.    In performing the above-described acts, Defendant City of Portland directly and proximately caused Plaintiff to suffer physical and mental harms and non-economic damages.

84.    Agents of the Defendant City of Portland is vicariously liable to Plaintiff for the above-described conduct, which took place within the time and place of the Defendant's agents and were in part motivated by the Defendant's agents' motivation to serve and in furtherance of law enforcement purposes the Defendant's agents were hired to perform.

### Claim 9: Intentional Infliction of Emotional Distress
#### (State Tort)

85.    Plaintiff re-alleges and incorporates the paragraphs above as if fully stated herein.

86.    Agents of the Defendant City of Portland intended to—and did—inflict severe emotional distress on Plaintiff when they shoved, beat, and pepper sprayed Plaintiff when complying to disperse. Alternatively, Plaintiff was certain or substantially certain to suffer severe mental or emotional distress as a result of Defendants' misconduct.

87.    Defendants' acts was outrageous and transgressed the bounds of socially tolerable conduct. Citizens do not expect sworn law enforcement officers to target citizens because of their constitutionally protected beliefs and when complying with police orders—especially when those citizens have committed no crimes—nor do they tolerate it.

88.    As a natural and probable consequence of Defendants' outrageous conduct, Plaintiff has suffered severe emotional distress, including fear for her physical safety, fear of further participating in his constitutional Free Speech rights.

## REASONABLE ATTORNEY'S FEES AND COSTS

89.    42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. § 1983.

90.    Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

## CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.    For economic and non-economic damages in an amount to be determined at trial;

B.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

C.    Such other relief as the court deems just and proper.

DATED: August 22, 2022.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*


*/s/ Franz Bruggemeier*
Franz Bruggemeier, OSB #163533
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

*/s/ Jonathan Gersten*
Jonathan Gersten, OSB # 191582
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*